UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KRIS TEPLIN,<br><br>       Plaintiff,<br><br>   v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>       Defendants. | Case No.17-cv-02445-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART THE UNITED STATES' MOTION TO DISMISS AND GRANTING WENDI JOINER'S MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 12, 17 |

Pending before the Court are two motions to dismiss Plaintiff Kris Teplin's Complaint: one by Defendant Wendi Joiner ("Joiner"), Dkt. No. 12, and another by Defendant United States ("the United States"), Dkt. No. 17. For the reasons set forth below, Joiner's motion is **GRANTED**, and the United States' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.      BACKGROUND

### A.      Factual Allegations

Plaintiff's suit arises out of the death of her son, Adam Emmott, who died after overdosing on fentanyl, a powerful narcotic. Dkt. No. 1 (Complaint or "Compl.") ¶¶ 1-2.

#### 1.      Joiner's Doctor-Patient Relationship with Emmott

In late 2012, Emmott came into the care of Joiner, *id.* ¶ 24(a), who at the time was a licensed physician employed by Coastal Health Alliance, *id.* ¶ 18. Coastal Health Alliance is a "federally-supported medical clinic" within the meaning of the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g). *Id.* ¶ 17. Soon after Emmott came into her care, Joiner became aware of his history of "abus[ing] opiates." *See id.* ¶ 24. She knew, for example, that he "ha[d] been treated for opiate addiction," *id.* ¶ 24(a), and in February 2013 observed that he relapsed and spent time in a drug-treatment program, *id.* ¶ 24(b).

On September 21, 2013, Emmott asked Joiner for narcotics to relieve "muscular pain," a request he supported with an MRI from 2009. *Id.* ¶ 24(c)-(d). Despite her observation that the MRI was "incomplete," Joiner provided Emmott with 240 oxycodone pills, 10 fentanyl patches, and three Butrans patches. *Id.* ¶ 24(d). On October 19, 2013, Emmott's urine tested positive for drugs beyond those Joiner had provided. *Id.* ¶ 24(e). As a result, Joiner informed him that the health center would "no longer be able to provide [him] with any controlled substance." *Id.* Less than a month later, however, Joiner prescribed 240 oxycodone pills and 10 fentanyl patches to Emmott, and continued to provide him with narcotics through the end of 2013. *Id.* ¶ 24(f).

Joiner next saw Emmott on July 26, 2014, when he "reported having recently been in jail, and having resumed use of heroin[]." *Id.* ¶ 24(g). The following month, Joiner gave Emmott a shot of morphine after he reported "buying methadone on the street." *Id.* ¶ 24(h). She also told him that she would be willing to provide him with "narcotic pain killers" if he consulted and obtained clearance from a pain management specialist in a way that provided her with "clear guidelines." *Id.* ¶¶ 25-26.

On December 11, 2014, Emmott met with Dr. Michael Yang, who had a pain management practice. *Id.* ¶ 27. Yang subsequently wrote to Joiner, communicating "a number of false representations [made by Emmott] to Dr. Yang whose falsity would have been obvious to Joiner." *See id.* (detailing claims by Emmott that he "had seen numerous spine surgeons who suggested surgery," and had been managing his pain with a regimen of fentanyl and oxycodone prescribed by Joiner). Yang deferred to Joiner on the medication question, stating that if she found it appropriate to continue prescribing Emmott narcotics, she could do so. *Id.* ¶ 28.

On December 12, 2014, Joiner prescribed Emmott a month's supply of fentanyl patches and 240 oxycodone tablets. *Id.* ¶ 29. Later that month, Emmott's insurance provider "denied Joiner's request for payment" for the medication "because Joiner had not attempted to use one of [the insurance provider's] approved medications before turning to Fentanyl patches." *Id.* ¶ 30. Also in December 2014, Plaintiff called Coastal Health Alliance and spoke with the health center's CEO, Steven Siegel. *Id.* ¶ 5(b). She warned him that Emmott "was engaging in drug-seeking behavior" and that "Joiner was giving [him] improper and dangerous prescriptions for

narcotics." *Id.*

On January 9, 2015, Emmott requested more fentanyl from Joiner. *Id.* ¶ 31. "When advised that his health plan would not cover [the cost of] the fentanyl, [he] volunteered to pay for [it] out of pocket." *Id.* Joiner agreed, and prescribed him a month's worth of fentanyl patches and 240 oxycodone tablets. *Id.* Two days later, on January 11, 2015, Emmott overdosed on fentanyl and died. *Id.* ¶ 32.

### 2. Joiner's Alleged Misconduct

While Emmott was in Joiner's care, Joiner was also under investigation by the California Medical Board. The investigation "revealed that between October 2013 and October 2014[,] Joiner wrote 33 fraudulent prescriptions for Xanax, Norco and Adderall under a fake name, and purportedly intended for her fiancé." *Id.* ¶ 5(a). Plaintiff also alleges that "Joiner took advantage of [Emmott's] desire for Fentanyl to obtain Oxycodone for her own use, distribution and sale to others." *Id.* ¶ 4; *see also id.* ¶¶ 6 (alleging "that one of Joiner's purposes in furnishing [Emmott] with prescription medications was . . . part of a scheme to procure Oxycodone for herself and others"), 36 (alleging that "Joiner prepared fraudulent prescriptions for [Emmott] . . . with the intent to jointly further both [his] interest in obtaining Fentanyl to satisfy his drug addiction and Joiner's interest in Oxycodone").

In December 2014, Joiner was arrested for "drunk driving and possession of controlled substances." *Id.* ¶ 5(c). Law enforcement officers found in her possession "fraudulently-obtained" medication belonging to her fiancé, as well as painkillers she said belonged to her. *Id.* She pled no contest and entered into a drug diversion program. *Id.*

In December 2015, Joiner was again arrested. Dkt. No. 40 at 4 (ECF pagination).[1] As relevant here, she was charged with possession for sale of acetaminophen/codeine ("Count 1") and

---

[1] The Court grants Joiner's request for judicial notice of documents related to her criminal proceedings in state court. *See* Dkt. No. 40; *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'") (citations omitted). The Court further notes Joiner's representation that Plaintiff is in agreement that the Court may consider these documents. *See* Dkt. No. 36 at 2. All references to Docket Number 40 use ECF pagination.

possession of fentanyl ("Count 5"). *See id.* at 4-7. Joiner pled guilty to Count 1 on May 5, 2016. *See id.* at 9-12. The remaining counts, including Count 5, were dismissed. *See id.* at 11, 27-28 (record of case events); *see also id.* at 22 (charges, pleas, and dispositions).

On March 17, 2016, Joiner surrendered her medical license. Compl. ¶ 19.

### B. Procedural Posture

Plaintiff filed the Complaint on April 28, 2017. Dkt. No. 1. On June 27, 2017, Joiner filed her motion to dismiss. Dkt. No. 12. Plaintiff filed an opposition on July 10, 2017, Dkt. No. 18, and Joiner replied on July 18, 2017. The United States filed its motion to dismiss on July 7, 2017. Dkt. No. 17. Plaintiff filed an opposition on July 21, 2017, Dkt. No. 20, and the United States replied on July 28, 2017, Dkt. No. 22.

On October 31, 2017, the Court ordered the parties to file supplemental briefing on the issue of its subject matter jurisdiction over Plaintiff's claim under California's Drug Dealer Liability Act. Dkt. No. 34. The parties submitted that briefing on November 14, 2017. *See* Dkt. Nos. 35, 36, 37. On November 15, 2017, the Court ordered the parties to file further supplemental briefing on the issue of Joiner's May 2016 conviction, and whether that impacted Plaintiff's standing and Joiner's potential liability under the Drug Dealer Liability Act. Dkt. No. 38. The parties submitted that briefing on November 29, 2017. *See* Dkt. Nos. 39, 41.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A defendant may move for dismissal on grounds that the court lacks subject matter jurisdiction over the action. Fed. R. Civ. P. 12(b)(1). It is the plaintiff's burden to establish subject matter jurisdiction. *See Ass'n of Am. Med. Colls. v. U.S.*, 217 F.3d 770, 778-79 (9th Cir. 2000); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 376-78 (1994). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* A factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*

**B.      Rule 12(b)(6)**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If dismissal is appropriate under Rule 12(b)(6), a court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citation and internal quotation marks omitted).

## III.    DISCUSSION

Plaintiff's claims arise under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA").[2]  She brings three causes of action: (1) wrongful death under the Drug Dealer Liability Act, Cal. Health & Safety Code §§ 11700 *et seq.* ("the DDLA"), against the United States and

---

[2] Plaintiff alleges that Joiner's former employer, Coastal Health Alliance, is a federally-supported medical center under 42 U.S.C. § 233(g).  Compl. ¶ 17.  Under section 233, a plaintiff seeking to bring a claim against such a medical center must bring an FTCA action.  *See* 42 U.S.C. § 233(a) (citing 28 U.S.C. §§ 1346(b), 2672)).

Joiner; (2) wrongful death based on non-medical negligence against the United States; and (3) wrongful death based on medical negligence against the United States. Additionally, within each cause of action, Plaintiff appears to assert a sub-claim against the United States based on negligent hiring, supervision, employment, and retention.

The United States moves to dismiss Plaintiff's Complaint in its entirety, with the exception of her medical negligence claim in her third cause of action. Joiner moves to dismiss Plaintiff's DDLA claim as it relates to her. The Court considers each motion in turn.

### A. Plaintiff's Challenged Negligence Claims Are Either Barred by Sovereign Immunity or Fail to State a Claim.

#### 1. To the extent Plaintiff's claims against the United States are based on a theory of negligent hiring, supervision, employment, and retention, they fall within the FTCA's discretionary function exception and are accordingly barred by the doctrine of sovereign immunity.

In each of her causes of action, Plaintiff asserts against the United States sub-claims for negligent hiring, supervision, employment, and retention. Specifically, she alleges that Siegel, as CEO of Coastal Health Alliance, had a duty to "reasonably supervise persons" like Joiner, "and to intervene when he learned of facts to suggest that" she was "misusing her position . . . in a manner that could be harmful" to patients and their families. Compl. ¶ 55; *see also id.* ¶¶ 66, 75. Such challenges to a government employee's supervision of a subordinate are barred by the discretionary function exception to the doctrine of sovereign immunity.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in nature," *id.*, meaning that a party's failure to establish a waiver of sovereign immunity is properly resolved on a motion to dismiss for lack of subject matter jurisdiction, *see Sierra Club v. Whitman*, 268 F.3d 898, 905-06 (9th Cir. 2001). The FTCA is one such waiver. Specifically, the FTCA waives the federal government's immunity from claims arising from

> the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "The scope of employment inquiry . . . is defined by the applicable state

law of respondeat superior." *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1163 (9th Cir. 2005).

The discretionary function exception, however, limits the FTCA's waiver of sovereign immunity, and exempts any claim based on a government employee's "exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). To determine whether government action falls within the discretionary function exception, the Supreme Court has set forth a two-pronged analysis. First, the challenged conduct must "involve an element of judgment or choice," as determined by the "nature of the conduct, rather than the status of the actor." *U.S. v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988); *U.S. v. Varig Airlines*, 467 U.S. 797, 813 (1984)) (citation, internal quotation marks, and brackets omitted). Second, the judgment of the government employee must be "of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). Given the exception's purpose—to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action—courts construe it as "protect[ing] only governmental actions and decisions based on considerations of public policy." *Id.* (quoting *Berkovitz*, 486 U.S. at 537). The "focus of the inquiry," then, is whether the "nature of the actions taken," pursuant to an exercise of discretion, "are susceptible to policy analysis." *Id.* at 325.

Because the United States does not appear to dispute that Siegel's conduct fell within the scope of his employment, and thus within the FTCA, the Court turns to the discretionary function exception inquiry.

### a. Siegel's management of Joiner involved an element of judgment or choice.

The parties are in agreement that Siegel's alleged duty to "supervise" Joiner and "intervene" if necessary involves an element of judgment or choice, and thus satisfies the first prong of the discretionary function inquiry. *See* Dkt. No. 17 at 8; Dkt. No. 20 at 3. The Court agrees. The Supreme Court has held that where "a federal statute, regulation, or policy

specifically prescribes a course of action for an employee to follow," no element of judgment or choice can be shown. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (internal quotation marks omitted). Here, however, Plaintiff has not alleged the existence of such a statute, regulation, or policy. *See Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010) (affirming dismissal because discretionary function exception shielded federal agency's decision not to discipline an asylum officer where plaintiffs had not "identified any mandatory duty to discipline" that officer). Moreover, the nature of Siegel's position as CEO plainly involved an element of judgment or choice in managing subordinates. *See Patterson v. Kelso*, No. 2:16-cv-0719 AC P, 2016 WL 4126726, at *6 (E.D. Cal. Aug. 2, 2016) (dismissing prisoner's negligent hiring, retention, and supervision claims against the receiver for the California prison healthcare system because "while defendant may have a duty to supervise medical personnel, how he chooses to carry out that duty . . . is left to his discretion").

### b. Siegel's management of Joiner involved the type of duty that the discretionary function exception was meant to shield.

The parties diverge with regard to the second prong: whether Siegel's alleged duty to supervise Joiner is "the kind that the discretionary function exception was designed to shield." *See Gaubert*, 499 U.S. at 322-23. The Court finds that it is.

"[D]ecisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function to shield." *Vickers v. U.S.*, 228 F.3d 944, 950 (9th Cir. 2000); *see also Nurse v. U.S.*, 226 F.3d 996, 1001 (9th Cir. 2000) (finding, in FTCA action, that defendants' "allegedly negligent and reckless employment, supervision, and training . . . [fell] squarely within the discretionary function exception"). The underlying question is whether the decision or action at issue is "susceptible to policy analysis." *See Gaubert*, 499 U.S. at 325. This requires consideration of whether the government entity "balanced competing public policy concerns in reaching its decision." *See Gager v. U.S.*, 149 F.3d 918, 921 (9th Cir. 1998).

On the facts alleged, the Court concludes that Siegel's decisions in hiring, supervising, and retaining Joiner are susceptible to policy analysis, and thus were intended to fall within the

discretionary function exception.[3]  Other examples of conduct found to be susceptible to policy analysis include decisions on how to prioritize "which termination [of employment] recommendations to review when and in what order," *see Vickers*, 228, F.3d at 951, and the decision by the U.S. Postal Service to limit "training and supervision in mail bomb detection" to places "where a known threat existed," *see Gager*, 149 F.3d at 921.  It makes sense that Siegel's decisions regarding the continued employment of a doctor at a federal health clinic would also involve "balanc[ing] competing public policy concerns," such as resource allocation, the handling of patient complaints, and the importance of addressing a disciplinary issue with a practitioner.

Plaintiff's argument to the contrary is unpersuasive.  In support of her argument that the discretionary function exception does not apply, Plaintiff cites *Brock v. U.S.*, 64 F.3d 1421 (9th Cir. 1995), and *Bennett v. U.S.*, 803 F.2d 1502 (9th Cir. 1986).  Both are inapposite.  In *Brock*, the Ninth Circuit affirmed the holding in *Bennett* that "the assault and battery exception [to the FTCA, 28 U.S.C. § 2680(h)] does not immunize the Government from liability for negligently hiring and supervising an employee."  64 F.3d at 1425; *see also Bennett*, 803 F.2d at 1503.  Plaintiff contends that these holdings "clearly authorize[]" her negligent hiring, supervision, employment, and retention sub-claims.  *See* Dkt. No. 20 at 3.  But *Brock* and *Bennett* are narrow in scope, and govern only those negligent hiring and supervision claims where the injury stems from a federal employee's assault or battery.  The Court declines to extend this principle in this case, given that Plaintiff does not allege assault or battery.

Moreover, Plaintiff mischaracterizes the holding in *Vickers* in asserting that "the decision whether or not to investigate [a shooting between a government employee and his ex-wife] was not [within the discretionary function exception]."  *See* Dkt. No. 20 at 5.  While *Vickers* did so hold, that was because "the failure to report or investigate . . . constituted a failure to follow the *mandatory requirements proscribed by agency regulations* as implemented by policy guidelines."

---

[3] Plaintiff alleges that she called Siegel in December 2014 to inform him that "Joiner was giving [her son] improper and dangerous prescriptions for narcotics," Compl. ¶ 5(b), and strongly implies that Siegel took no subsequent action.  This does not change the Court's analysis, because "negligence in performing discretionary functions is not actionable."  *See Vickers*, 228 F.3d at 950 (citing *Varig Airlines*, 467 U.S. at 811).

228 F.3d at 953 (emphasis added). In other words, the agency in that case failed to satisfy the first prong of the discretionary function inquiry, because there is no element of choice or judgment where there is an on-point regulatory mandate.

Accordingly, the Court grants the United States' motion as to Plaintiff's sub-claims of negligent hiring, supervision, employment, and retention because they fall within the discretionary function exception to the doctrine of sovereign immunity. They are thus outside this Court's subject matter jurisdiction.

### 2. Plaintiff's wrongful death claim based on a theory of "non-medical negligence" fails to state a plausible claim.

Plaintiff styles her second cause of action as "wrongful death based on non-medical negligence," Compl. at 11 (section heading), compared to the medical negligence alleged in her third cause of action. The United States argues that the "gravamen" of this claim "is medical negligence and should be construed as such." *See* Dkt. No. 17 at 9. Plaintiff, in turn, cites Federal Rule of Civil Procedure 8(d)(3) for the proposition that "[a] party may state as many separate claims or defenses as it has, *regardless of consistency*." Dkt. No. 20 at 7 (original emphasis).

While Plaintiff "may, of course, plead more than one legal theory in the alternative," she "should provide plausible facts that support each theory." *See Coffen v. Home Depot U.S.A. Inc.*, No. 16-cv-03302-PJH, 2016 WL 4719273, at *6 (N.D. Cal. Sept. 9, 2016). Plaintiff has failed to do so. While the United States appears to concede that Plaintiff has adequately pled a claim of medical negligence, she fails to allege sufficient facts in support of any other variant of a negligence claim. All of the facts alleged by Plaintiff regarding Joiner and Emmott's relationship have to do with Joiner's conduct in her role as Emmott's physician. Plaintiff's sole attempt at differentiating Joiner's alleged medical and non-medical negligence is a wholly conclusory assertion that, as to the latter, "Joiner's conduct . . . was undertaken for a purpose other than delivering medical care." *Id.* ¶ 65. Such an assertion, without supporting factual allegations, is insufficient to state a negligence claim stemming from conduct other than that undertaken by Joiner in her professional role.

Accordingly, the Court grants the United States' motion as to Plaintiff's claim for non-

medical negligence.

**B.    Plaintiff's Claim Under the DDLA Survives in Part.**

Plaintiff asserts her DDLA claim against the United States "and, to the extent this cause of action cannot be brought under the FTCA," against Joiner "in her individual capacity."  Compl. at 9.

The DDLA is a California statute intended "to provide a civil remedy for damages to persons in a community injured as a result of the use of an illegal controlled substance," and enables plaintiffs "to recover damages from those persons in the community who have joined the marketing of illegal controlled substances."  Cal. Health & Safety Code § 11701.  As a preliminary matter, the Court finds that it has supplemental jurisdiction over Plaintiff's DDLA claim.  It is sufficiently related to her negligence claims such "that they form part of the same case or controversy under Article III of the United States Constitution."  *See* 28 U.S.C. § 1367(a).  The Court notes that, as described below, this case poses a novel issue of state law regarding the relationship between two DDLA provisions, which is a ground upon which this court "*may* decline to exercise supplemental jurisdiction."  *See id.* § 1367(c)(1) (emphasis added).  Still, given the unique posture of this case—and the permissive language of section 1367(c)—the Court elects to exercise its supplemental jurisdiction over this claim.[4]

**1.    The United States fails to meet its burden of showing that Plaintiff's DDLA claim should be dismissed.**

Plaintiff confirmed at a status conference, *see* Dkt. No. 46, that her DDLA claim against the United States is not solely dependent on a theory of negligent hiring, supervision, employment, and retention.  At the same hearing, the United States acknowledged that it did not move to dismiss the DDLA claim on any other ground.  Thus, at this juncture, it is unclear what—if anything—remains of Plaintiff's DDLA claim against the United States now that the negligent hiring, supervision, employment, and retention sub-claim has been dismissed.  More fundamentally, Plaintiff has cited no legal authority that would allow her to assert a DDLA claim

---

[4] The Court is cognizant of the potential comity concerns that arise when a federal court decides novel issues of state law.  All parties in this case, however, are in agreement that the Court may properly exercise supplemental jurisdiction here.  *See* Dkt. Nos. 35, 36, 37.  Moreover, given that this Court has exclusive jurisdiction over Plaintiff's DDLA claim against the United States, the convenience of the parties favors keeping the entire action in a single forum.

directly against the federal government. The latter circumstances notwithstanding, however, the United States did not meaningfully address any of these points in its moving papers, and thus failed to meet its burden of showing that the claim should be dismissed on the pleadings.

Accordingly, to the extent Plaintiff's DDLA claim against the United States is not premised on a theory of negligent hiring, supervision, employment, and retention, the United States' motion is denied. This denial does not preclude the government from seeking summary judgment as to this claim.

### 2. Plaintiff either lacks standing to bring a DDLA claim against Joiner or that claim is time-barred.

As for Plaintiff's DDLA claim against Joiner, Joiner contends that Plaintiff lacks standing to bring a DDLA claim, and that such a claim would be untimely in any event. Alternatively, Joiner argues that Plaintiff fails to state a claim under the DDLA. Because the Court agrees with Joiner's standing and timeliness arguments, it need not reach the question of whether Plaintiff states a claim.

### a. The DDLA's statute of limitations applies to Plaintiff's claim.

Joiner first argues that Plaintiff's claim is governed by section 340.5 of the California Code of Civil Procedure. *See* Dkt. No. 12 at 5. Under that provision, which establishes a limitations period for wrongful death actions based on professional negligence, "the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." Cal. Civ. Proc. Code § 340.5. Plaintiff argues that section 340.5 does not apply to actions under the DDLA, because "furnishing opiates to a known opiate addict" does not fall within the ambit of professional negligence. *See* Dkt. No. 18 at 3.

The Court agrees that the statute of limitations for medical malpractice actions set forth in the California Code of Civil Procedure does not govern Plaintiff's DDLA claim, but for a different reason than posited by Plaintiff. The DDLA has its own limitations provision, and "a specific statute of limitations takes precedence over a general one, even though the latter would be broad enough to include the subject to which the more particular provision relates." *See Vafi v.*

*McCloskey*, 193 Cal. App. 4th 874, 880 (2011) (citation and internal quotation marks omitted); *see also Sisseton-Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, N.D & S.D. v. U.S.*, 895 F.2d 588, 594 (9th Cir. 1990) ("We agree that when legislation contains its own statute of limitations, the more specific limitation preempts a more general statute of limitations.") (citation omitted). Accordingly, the Court turns to the DDLA itself to determine the applicable limitations period.

### b. The Court must resolve a novel question of state law to determine whether Plaintiff has standing or is time-barred from bringing a DDLA claim against Joiner.

Joiner next argues that Plaintiff either lacks standing or is time-barred from bringing a claim against her under the DDLA, an assertion with which Plaintiff disagrees. At the heart of their dispute is a novel question regarding the relationship between the DDLA's standing provisions and its statutes of limitations.

### i. The DDLA does not detail the intended relationship between its standing provisions and its statute of limitations provisions.

The DDLA confers standing to sue on several categories of plaintiffs. *See* Cal. Health & Safety Code § 11705. As relevant here, the parent of a controlled substance user may seek damages under the DDLA from:

> (1) A person who sold, administered, or furnished an illegal controlled substance to the individual user of the illegal controlled substance.

> (2) A person who knowingly participated in the marketing of illegal controlled substances, if all of the following apply:

> > (A) The place of illegal activity by the individual user of an illegal controlled substance is within the city, city and county, or unincorporated area of the county in which the defendant's place of participation is situated.

> > (B) The defendant's participation in the marketing of illegal controlled substances was connected with the same type of specified illegal controlled substance used by the individual user of an illegal controlled substance, and the defendant has been convicted of an offense for that type of specified illegal controlled substance.

> > (C) The defendant participated in the marketing of illegal controlled substances at any time during the period the

individual user of an illegal controlled substance illegally used the controlled substance.

(D) The underlying offense for the conviction of the specified illegal controlled substance occurred in the same county as the individual user's place of use.

Cal. Health & Safety Code § 11705(b). Moreover, all DDLA claims are subject to one of two limitations periods:

(a) Except as otherwise provided in this section, a claim under this division shall not be brought more than one year after the defendant furnishes the specified illegal controlled substance. . . .

(b) For a defendant, the statute of limitations under this section does not expire until one year after the individual potential defendant is convicted of a criminal offense involving an illegal controlled substance or as otherwise provided by law.

*Id.* § 11714. The DDLA does not detail the intended relationship between the provisions in section 11705(b) and those in section 11714.

### ii. Read together, the DDLA's standing provisions and statute of limitations are determinative of Plaintiff's claim against Joiner.

Joiner contends that because she "was a physician who directly prescribed the controlled substance that the decedent used," *see* Dkt. No. 12 at 9, Plaintiff could have standing to sue only under section 11705(b)(1), which in turn triggers the limitations period in section 11714(a), *see* Dkt. No. 39 at 3. Under section 11714(a), a cause of action accrues when a claimant "has reason to know" that a person was harmed due to that person's use of an "illegal controlled substance."[5] Plaintiff does not dispute Joiner's contention that her DDLA claim accrued on January 11, 2015, when Emmott is alleged to have died of a fentanyl overdose. Thus, Joiner concludes that under section 11714(a), the limitations period expired a year later, on January 11, 2016—more than a year before Plaintiff filed this action on April 28, 2017.

Plaintiff appears to assert that she has standing to bring a DDLA claim under section 11705(b)(2), as opposed to section 11705(b)(1). *See* Dkt. No. 18 at 4. Applying that provision,

---

[5] For purposes of analyzing the timeliness issue, the Court assumes without deciding that the drugs allegedly prescribed by Joiner to Plaintiff were "illegal controlled substances" within the meaning of the statute.

Plaintiff argues that because Joiner was convicted of possession of narcotics with intent to sell on May 5, 2016, *see* Compl. ¶ 5(h), the statute of limitations—per section 11714(b)—actually expired a year after *that*, on May 5, 2017, shortly after Plaintiff filed the Complaint, *see* Dkt. No. 18 at 4. In response, Joiner contends that the limitations period in section 11714(b) does not apply, because Plaintiff does not meet the requirements for standing under section 11705(b)(2). *See* Dkt. No. 39 at 2. Specifically, Joiner argues that in order for her conviction to serve as a basis for standing under section 11705(b)(2)(B), it had to involve fentanyl, *i.e.*, the same drug which caused Emmott's death. *See id.* at 2-3. Joiner, however, was convicted only for possession for sale of acetaminophen and codeine—not fentanyl. *See* Dkt. No. 40 at 4-7, 27-28.

Plaintiff appears to counter that she can mix and match, so to speak, the DDLA's standing and statute of limitations provisions, disagreeing with Joiner's contention that section 11714(b) applies only to defendants who do not directly furnish an illegal controlled substance, as described in section 11705(b)(1). *See* Dkt. No. 18 at 5. And indeed, if Plaintiff could assert standing under section 11705(b)(1) and invoke the limitations period in section 11714(b), her claim likely would be timely. That is to say, if she brought suit under section 11705(b)(1) because Joiner "furnished" Emmott with fentanyl, but was subject to section 11714(b), the deadline for filing suit would be "one year after the individual potential defendant is convicted of a criminal offense involving an illegal controlled substance." Plaintiff could then argue that Joiner's May 5, 2016 drug conviction meets the requirement of section 11714(b), which would push her filing deadline to May 5, 2017—days *after* she filed this Complaint. Joiner, for her part, says that because Joiner "directly prescribed the controlled substance" used by Emmott, section 11714(a) applies. *See* Dkt. No. 12 at 9.

The determinative issue in deciding which statute of limitations applies, therefore, is whether the standing provisions within section 11705(b) are somehow related to the limitations period provisions within section 11714. Put differently, the question is whether the DDLA claim of a plaintiff suing a defendant described in section 11705(b)(1) is *necessarily* governed by the limitations period in section 11714(a), while the DDLA claim of a plaintiff suing a defendant described in section 11705(b)(2) is likewise governed by section 11714(b)(2)—*or*, if a plaintiff

may simply invoke whichever standing provision and limitations period works best for her DDLA claim.

### iii. Plaintiffs who sue under the DDLA may not mix and match the statute's standing provisions and limitations periods.

This Court must decide whether plaintiffs can mix and match the DDLA's standing provisions and limitations periods. Based on the facts as alleged, Plaintiff's claim survives only if such mixing and matching is permissible under the statute. The Court finds that it is not.

Because the California Supreme Court has not decided this novel question of state law, this Court's task "is to predict how the state high court would resolve it." *Hayes v. Cnty. of San Diego*, 658 F.3d 867, 871 (9th Cir. 2011) (quoting *Westlands Water Dist. v. Amoco Chem. Co.*, 953 F.2d 1109, 1111 (9th Cir. 1991)). This does not mean the Court is "free to reject" an on-point ruling by a lower state court "merely because it has not received the sanction of the state's highest court." *Id.* at 871-72 (quoting *Katz v. Children's Hosp.*, 28 F.3d 1520, 1528-29 (9th Cir. 1994)). Rather, "[a]n intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id.* at 872 (quoting *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982)).

Here, the Court has found only one opinion by the California Court of Appeal that provides a "datum for ascertaining state law": *Barker v. Garza*, 218 Cal. App. 4th 1449 (2013), which was decided by a 2-1 margin and included a thoroughly-reasoned dissenting opinion. In *Barker*, the plaintiff brought a DDLA claim against her deceased brother's nurse, who was alleged to have illegally provided him with fentanyl and Klonopin, the combination of which resulted in his death. 218 Cal. App. 4th at 1452. The issue was whether the statute of limitations in section 11714(a) was tolled by the California Code of Civil Procedure's minority tolling provision until the plaintiff reached the age of majority. *Id.* at 1453.[6] In reaching its conclusion that California's

---

[6] The court in *Barker* also considered whether section 11714(b) "tolled [the plaintiff's] claim until the expiration of the time in which [the defendant] could have been prosecuted for controlled substance offenses." 218 Cal. App. 4th at 1453. It devoted only one paragraph to this issue, however, deeming it waived and finding nothing in the record to suggest that the defendant was

minority tolling provision did not apply to DDLA claims, the court cast section 11714(b) as a "tolling provision," from which it could "infer legislative intent to exclude all other grounds for tolling." *See id.* at 1460 (internal quotation marks omitted). On this point, the *Barker* majority disagreed with the characterization of section 11714(b) as "an enlarged limitations period applicable to only certain defendants":

> [i]n the dissent's view, [sections 11703, 11704, and 11705] "distinguish[] two groups of potential civil defendants: (1) [t]hose who sell or furnish drugs to an individual user; and (2) those who participate in other marketing activities by requiring that the latter have been convicted of a drug offense arising from their participation." . . . That is correct, but we disagree that distinction carries over to Health and Safety Code section 11714, with subdivision (a) only applying to the former category of individuals, and subdivision (b) only applying to the latter.

*Id.* at 1461 (citation omitted). The court provided two reasons. First, it wrote, "both categories of defendants"—*i.e.*, those described in both sections 11705(b)(1) and (2)—"can 'furnish' controlled substances to trigger the statute of limitations in section 11714[(a)]." *Id.* Second, the language of section 11714(b) is "broad, applying to 'a defendant' and covering any 'criminal offense involving an illegal controlled substance' . . . which could very well include convictions for the direct sale or furnishing of an illegal controlled substance." *Id.* Likewise, the "individual potential defendant" in section 11714(b) "could be any defendant liable under the DDLA, whether as a market participant or a direct seller, but who has not yet been named in the lawsuit." *Id.* at 1461-62. Accordingly, it concluded that section 11714(b) "is no more than a tolling provision applying to all defendants under the DDLA." *Id.* at 1462.

The dissent disagreed with the majority's characterization of section 11714(b) as a "tolling provision," *see id.* at 1468, instead describing it as an *exception* to the general rule set forth in section 11714(a), and finding that this exception "creates . . . an enlarged limitations period applicable to only certain defendants," *id.* at 1469. Noting that the two "competing provisions" of section 11714 "seem confusing and contradictory," the dissent nevertheless found a "reasonable construction . . . by examining them against other provisions" of the DDLA. *Id.* at 1470. Starting with section 11705(b), the dissent noted that "an action may not be brought against one who did

---

ever prosecuted or convicted. *Id.* at 1462-63.

not furnish the drug but instead knowingly participated in the marketing of illegal controlled substances under [section 11705(b)(2)] unless certain conditions are met." *Id.* In this way, the DDLA "distinguishes two groups of potential civil defendants: (1) Those who sell or furnish drugs to an individual user and (2) those who participate in *other* marketing activities by requiring that the latter have been convicted of a drug offense arising from their participation." *Id.* at 1470-71 (emphasis added). The statutes of limitations, the dissent reasoned, "make[] a similar distinction." *See id.* at 1471. That is,

> the one-year time period of [section 11714(a)] applies to defendants who actually furnished the drug, as to whom no conviction is required as a predicate to liability under the Act. [Section 11714(b)] applies a differently calibrated one-year limitations period to "individual potential defendant[s]," which I believe refers to defendants whose liability under the Act is based on marketing participation activities apart from selling or furnishing drugs to the individual user. Because a conviction for a drug-related offense arising from their marketing participation activities is a condition precedent to liability under the Act, this subdivision sets them apart as *potential defendants* by providing a one-year limitations period that runs from the date of any conviction. This makes sense because until and unless such *potential* defendants are convicted, they cannot be held liable under the Act.

*Id.* (original emphasis). Thus, the point of section 11714(b) "is to create a different limitations period for claims against a *subcategory of potential defendants*." *Id.* (emphasis added).

The Court finds the dissent's analysis persuasive, and believes the California Supreme Court would agree. On its face, section 11705(b) distinguishes between two sub-groups of defendants who are subject to liability under the DDLA: those who (as relevant here) directly furnish illegal drugs to a claimant's relative, and those who knowingly participate in the marketing of illegal drugs in some way *other* than directly furnishing drugs to such a person. This is consistent with the broadly-worded purpose of the statute, which aims in part to enable claimants "to recover damages from those persons in the community who have joined the marketing of illegal controlled substances." *See* Cal. Health & Safety Code § 11701. Moreover, it is most logical to carry this reasoning over to section 11714, the language of which tracks section 11705(b): for those defendants who have directly furnished the drug to a person related to the claimant, section 11714(a) applies; for those defendants who have knowingly participated in the

18

marketing of illegal drugs in some other way within the meaning of the statute, section 11714(b) describes the applicable limitations period, based on the date of the defendant's qualifying conviction.

The Court respectfully disagrees that the California Supreme Court would adopt the reasoning of the majority opinion in *Barker*. First, the Court disagrees with the majority's conclusion that section 11714(b) is a tolling provision, rather than an *exception* to section 11714(a): the provision does not use the word "toll," nor does it mention or refer to the concept of equitable relief from an otherwise-applicable statute of limitations. Further, the Court believes the majority's analysis of the relationship between sections 11705 and 11714(b) is difficult to reconcile with the language of those provisions. Specifically, the majority's reasoning that section 11714(a) applies to both categories of defendants in section 11705(b), because both categories *can* furnish controlled substances, overlooks a key difference between sections 11705(b)(1) and (2): under section 11705(b)(1), a DDLA defendant has to sell, administer, or otherwise furnish drugs to an "individual user" who, as relevant here, is related to the claimant. Under section 11705(b)(2), however, the defendant need only furnish drugs to someone *in the individual user's community*. The limitations periods in section 11714 reflect this distinction: section 11714(a) references "the harm from use of an illegal substance," indicating a textual connection to section 11705(b)(1). Section 11705(b)(2), rather than requiring such "harm from use," addresses the harm that results when a defendant sells or otherwise furnishes the same drug used by an individual user in the same geographic area, during the same time period. Section 11705(b)(2)'s additional requirement that a defendant have been convicted for such drug-dealing activity provides a clear textual connection to section 11714(b).

Because the California Supreme Court has not yet decided the nature of the relationship between sections 11705(b) and 11714 of the DDLA, this Court is obligated to try to predict the conclusion it would reach, while giving due deference to the California Court of Appeal's decision in *Barker*. *See Hayes*, 658 F.3d at 867, 871. In this case, while the decision of the majority in *Barker* is a "datum for ascertaining state law," the Court is convinced by the "persuasive data" and

reasoning in the dissent that the California Supreme Court "would decide otherwise."[7] *See id.* at 872. This is especially true given that the *Barker* court said that it was "address[ing] only two narrow issues," neither of which was identical to the question confronting the Court in this case. *Cf. Barker*, 218 Cal. App. 4th at 1453. Accordingly, this Court finds that under the DDLA, plaintiffs may not simply invoke whichever standing provision and statute of limitations is most favorable for them: section 11714(a) governs claims against the defendants described in section 11705(b)(1), and section 11714(b) governs claims against the defendants described in section 11705(b)(2).

### iv. Plaintiff either lacks standing to sue Joiner under the DDLA or is time-barred from bringing a claim.

Considering Plaintiff's DDLA claim against Joiner in light of the analysis above, it is clear that either she lacks standing, or her claim is untimely.

If Plaintiff brings her DDLA claim under section 11705(b)(1), on the grounds that Joiner "sold, administered, or furnished an illegal controlled substance" to Emmott, then section 11714(a) governs her case. Plaintiff does not dispute that her claim accrued on January 11, 2015, the day of Emmott's death. Plaintiff was therefore required to bring her claim no later than one year later, on January 11, 2016. Because she filed this action on April 28, 2017, Plaintiff's claim is time-barred.

Alternatively, if Plaintiff seeks to bring her claim under section 11705(b)(2), on the grounds that Joiner "knowingly participated in the marketing of an illegal controlled substance,"

_____

[7] The dissent's interpretation was further "bolstered by a fuller examination of the Act's legislative history." *Barker*, 218 Cal. App. 4th at 1471. The dissent noted that when the DDLA was first introduced in February 1996, the initial iteration of section 11714(b) stated: "'[f]or a plaintiff, the statute of limitations under this section *is tolled . . .*' while the plaintiff was incapacitated by his use of illegal drugs, and, for a defendant, the statute of limitations '*[was] tolled*' until six months after his conviction of a drug offense." *Id.* at 1471-72 (quoting Sen. Bill No. 1754 (1995-1996 Reg. Sess.) as introduced Feb. 22, 1996) (original emphasis, brackets, and ellipses). Later, the tolling language "was deleted and replaced with language that enlarged the limitations period for certain defendants." *Id.* at 1472. In light of the principle that "[l]egislative rejection of specific language in an act as originally introduced is persuasive evidence the act should not be construed to include the omitted language," *id.* at 1471 (citing *Conservatorship of Bryant*, 45 Cal. App. 4th 117, 130 (1996), the dissent persuasively reasoned that the California legislature "did not intend [section 11714(b)] to serve as a tolling provision," *see id.* at 1472.

United States District Court
Northern District of California

United States District Court
Northern District of California

she must show that: (1) Emmott used an illegal controlled substance within the "city, city and county, or unincorporated area of the county" in which Joiner's "place of participation is situated"; (2) Joiner's "participation in the marketing of illegal controlled substances was connected with the same type of specified illegal controlled substance" used by Emmott, and Joiner "has been convicted of an offense for that type of specified illegal controlled substance"; (3) Joiner "participated in the marketing of illegal controlled substances at any time during the period" Emmott used a controlled substance; and (4) "[t]he underlying offense for the conviction of the specified illegal controlled substance occurred in the same county" in which Emmott used a controlled substance. Plaintiff argues that Joiner's conviction on May 5, 2016 is a conviction within the meaning of section 11705(b)(2)(B). *See* Cal. Health & Safety Code § 11705(b)(2)(A)- (D). But Emmott died of a fentanyl overdose, *see* Compl. ¶ 32, and Joiner's conviction was for possession for sale of acetaminophen and codeine, *see* Dkt. No. 40 at 4-7, 27-28. The language of section 11705(b)(2) is clear: Joiner's participation in the marketing of illegal drugs must be "connected with the *same type* of specified illegal controlled substance" used by Emmott, and she must "[have] been convicted of an offense *for that type* for specified illegal controlled substance." *See* Cal. Health & Safety Code § 11705(b)(2)(B) (emphasis added). Thus, because Plaintiff is suing to recover for her son's fatal *fentanyl* overdose, she cannot sue Joiner under section 11705(b)(2) on the basis of her conviction for possession for sale of *acetaminophen* and *codeine*.

Plaintiff thus is either time-barred from bringing a DDLA claim against Joiner or lacks standing to do so. Joiner's motion is accordingly granted.

### C. Plaintiff Is Granted Leave to Amend Her Wrongful Death Claim Based on Non-Medical Negligence and Her DDLA Claim Against Joiner.

The Court will grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez*, 203 F.3d at 1130 (citation omitted). Accordingly, the Court grants Plaintiff leave to amend the claim she styles as one for wrongful death based on "non-medical negligence." While Plaintiff failed to plead facts supporting such a cause of action—particularly in conjunction with her claim based on medical negligence—the Court cannot say at this juncture that it would be impossible for Plaintiff to do so. The same is

true of Plaintiff's DDLA claim against Joiner, for which the Court also grants leave to amend. If Plaintiff can truthfully plead facts showing that she has standing to sue Joiner under section 11705(b)(2), that may render her claim timely under section 11714(b).

Leave to amend is denied, however, as to Plaintiff's claims of negligent hiring, supervision, employment, and retention against the United States. The Court is satisfied there are no additional facts Plaintiff could plead to show that those claims are not barred by sovereign immunity.

## IV.    CONCLUSION

For the foregoing reasons, the Court rules as follows:

The United States' motion is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's sub-claims of negligent hiring, supervision, employment, and retention against the United States are **DISMISSED WITH PREJUDICE**. Plaintiff's wrongful death claim based on non-medical negligence against the United States is **DISMISSED WITH LEAVE TO AMEND**. The United States' motion is **DENIED** as to Plaintiff's DDLA claim, to the extent it is not predicated on the sub-claim of negligent hiring, supervision, employment, and retention.

Joiner's motion is **GRANTED**, and Plaintiff's DDLA claim as to her is **DISMISSED WITH LEAVE TO AMEND**.

Should Plaintiff choose to amend the Complaint as to her wrongful death claim based on non-medical negligence and her DDLA claim, she is directed to do so in accordance with the discussion above no later than 28 days from the date of this Order.

**IT IS SO ORDERED.**

Dated:  3/26/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge